UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Invictus Lighting LLC<br><br>Plaintiff,<br><br>v.<br><br>RAB Lighting, Inc.<br><br>Defendant. | Case No. 25-cv-5289<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Invictus Lighting LLC d/b/a Invictus Lighting (hereinafter "Invictus"), for its Complaint against Defendant RAB Lighting Inc. (hereinafter "RAB Lighting"), alleges as follows:

**THE PARTIES**

1. Plaintiff Invictus is a limited liability company registered in North Carolina with its principal place of business at 1260 25th Street Place Southeast Hickory, NC 28602.

2. Defendant RAB Lighting is a privately held company incorporated in the State of New York (DOS ID 66004). It has its principal place of business at 170 Ludlow Ave, Northvale, NJ 07647.

**JURISDICTION AND VENUE**

3. This lawsuit is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 et seq.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5. This Court has personal jurisdiction over RAB Lighting because RAB Lighting is incorporated in the state of New York, in the County of New York.

1

6. Venue is proper in this judicial district under 28 U.S.C. § 1400(b) because RAB Lighting is incorporated in the county of New York within the state of New York, has a registered office for service of process at 122 East 42nd Street, 18th Floor, New York, New York, 10168, and has its principal place of business outside the state of New York. Venue is also proper in this judicial district under 28 U.S.C. § 1400(b) because RAB Lighting has a regular and established place of business within this judicial district, at 408 W. 14th St., 3rd floor, New York, NY, 10014, and has committed acts of infringement in this judicial district, including by inter alia using and selling infringing products within this judicial district.

## BACKGROUND

7. Invictus is a U.S.-based light emitting diode ("LED") lighting technology company headquartered in Hickory, North Carolina which offers unique, efficient, and cost-effective lighting fixtures and retrofits. Founded in 2015 by G. Erik McMillan, the sole inventor of U.S. Patent No. 9,801,245 ("the 245 Patent"), attached hereto as **Exhibit 1**, and his wife Kisa McMillan, Invictus has pioneered innovations in energy-efficient lighting systems. Its flagship feature—"wattage selectability"—has been broadly adopted within the industry and recognized by the Design Lights Consortium ("DLC") as a whole new product category: "Field Adjustable Lighting."

8. Wattage selectability enables a single lighting fixture to replace an entire range of wattage-specific models, providing cost savings, inventory simplification, and enhanced regularly compliance. This innovation is reflected in the claims in the 245 Patent and was utilized by Invictus in lighting installations for customers and locations including the Department of State, Fort Meade, the Great Lakes Naval Base.

9. Despite an onslaught on infringers, Invictus continues to offer a suite of products for sale that embody the invention of the 245 Patent (see Watt Selectable products https://www.invictuslighting.com/catalog). Invictus' research and development (and other technical work, such as inspection, testing and quality control) has occurred in the United States.

**PRIOR ART APPROACH AND TECHNICAL BREAKTHROUGH OF THE 245 PATENT**

10. Before the advent of the invention set forth in the 245 Patent, lighting systems were limited to one of two configurations: (i) a *single* factory-set maximum wattage output; (ii) integration with a standard 0-10V dimming system, which allowed modulation of brightness and energy consumption within the constraints of a *single* wattage interval between a pre-set minimum wattage output (typically zero) and the *single* factory-set maximum wattage output.

11. The standard 0–10V dimming protocol—common in commercial and industrial settings—functions by adjusting voltage to vary the light output, *i.e.*, controlling the brightness of compatible lighting fixtures. At 10 volts, the light fixture will achieve full brightness, while at 0 volts, it will dim to a minimum level, which may not always be completely "off" without additional switching mechanisms. Hereinafter, "standard 0-10V dimmers" refers to a dimmers that conform to the 0-10V dimming standard.

12. Prior to the 245 Patent, standard 0-10V dimmers were, on information and belief, widely used for dimming LEDs—*i.e*, controlling light intensity, and thus wattage consumption. At that time, LEDs were considered difficult, or even impossible, to dim with a "common-line" dimmer, which would dim by various other well-knows means, such as phase-cutting or voltage-lowering.

13. A *single* factory-set maximum wattage output was not ideal, as was made apparent by the invention of the 245 Patent. But prior to the invention, the deficiencies of the prior art were not noticed or apparent to the lighting industry, or one of ordinary skill in the art.

14. At that time, LED light fixtures had long been widely accepted, installed and used with popular standard 0-10V dimmers. Accordingly, conventional and prevailing wisdom of the prior art was that, with the wide availability of standard 0-10V dimmer systems, which were designed, standardized, and functioned to limit the maximum wattage consumption through dimming, there was no seemingly apparent meaningful benefit (beyond what both the single factory-set maximum wattage output of an LED light fixture and a standard 0-10V dimmer already collectively provided), and therefore no meaningful need, to provide an LED light fixture with multiple adjustable/selectable options for maximum wattage output.

15. During prosecution of the application that led to the 245 Patent, the U.S. Patent and Trademark Office ("USPTO" or "PTO") identified the "Reed" reference, US 2013/0163243, which describes a retrofit LED device incorporating a user-adjustable actuator as being potentially concerning. But the Reed reference was ***overcome***, which led to the granting of the 245 Patent, as Reed's system differs fundamentally from the 245 Patent in three critical respects.

16. First, Reed's solution applies to non-fixture retrofit devices and requires specialized drivers with embedded feedback circuits. In contrast, the '245 Patent enables wattage control *within* the fixture housing itself, using standard LED drivers.

17. Next, Reed disavows compatibility with dimming controls, categorically criticizing their suitability for adjusting maximum light output. The '245 Patent does the opposite: it leverages existing dimmer infrastructure (e.g., 0–10V systems) to dynamically and cooperatively manage power delivery.

18. Finally, Reed's adjustable actuator is user-accessible post-installation, potentially allowing tampering or accidental changes. The '245 Patent, by design, restricts access to installers at the time of installation, ensuring stability and regulatory conformity post-deployment.

19. By contrast, the 245 Patent addresses the aforementioned deficiency of the prior art and has proven to be a breakthrough in enabling an installer installing a light fixture incorporating the invention to, even prior to the installation, select, adjust, or otherwise limit, a maximum wattage output from among a set of multiple preset options thereof through an innovative wattage limiter, with wattage limiter being provided in or on the housing of the light fixture and adapted to leveraging, and working in concert with, a well-defined and already prevailing dimming functionality provided by, *e.g.*, a standard 0-10V dimmer, thus allowing a pre-installation dynamic interaction with the installer and in the meantime effectively preventing an average Joe from any post-installation interaction and thus interference, while ensuring that fixtures do not exceed the preselected maximum threshold with regard to the wattage output. This breakthrough enabled, as will be further provided below, significant flexibility and efficiency, reducing SKU count, streamlining installation, and maintaining regulatory compliance.

## PATENT-IN-SUIT

20. Nearly eight years before the filing of this complaint, on October 24, 2017, the United States Patent and Trademark Office ("USPTO" or "PTO") duly and legally issued U.S. Patent No. 9,801,245 ("the 245 Patent"), titled "Light Fixture." The 245 Patent results from a continuation of Application No. 14/444,997 ("the 997 Application") originally filed with the United States on July 28, 2014. The 997 Application itself claimed priority to two provisional applications filed on July 26, 2013 and March 11, 2014, respectively. The 245 Patent names

Invictus' founder and CEO G. Erik McMillan as its sole inventor. The 245 Patent will not expire until July 28, 2034.

21. The 245 Patent generally describes an apparatus that is configured to be installed with a predetermined maximum wattage output wherein the maximum wattage output can be selected (from multiple preset options) by the installer. The light fixture includes a housing and a wattage limiter (whose implementation may comprise an adjustable resistor). A light source is electrically coupled to the wattage limiter, and the wattage limiter itself is associated with the housing. See 245 Patent, Abstract & 3:1-7.

22. The invention can be better understood in conjunction with the circuit 10 illustrated in Figure 1 of the 245 Patent:



Patent, FIG. 1.

23. The circuit 10 includes a dimming controller or control module 12 that may be, for example, a standard 0-10V dimmer implemented with, *e.g.*, well-known pulse-width modulation

(PWM). The PWM controls the downstream pulse of power from the switch box 15 to where a switch box 15 includes the dimming controller 12. The dimming controller 12 may be adjusted by turning off of a knob, to select a desired dial level, or by smart adjustments that may be effectuated by selecting a desired dimming level on a touch-responsive control panel.

24. The circuit 10 may further include a wattage limiter which may be implemented with, e.g., an adjustable resistor 14. The adjustable resistor 14 may be connected downstream of, and in series connection with, the dimming controller 12 and switch box 15. See generally 245 Patent, 5:1-42 & Fig. 1.

25. The circuit 10 may further include a driver 16 connected downstream and in series with the adjustable resistor 14. The driver 16 is an internal mechanism that regulates power to a light source and is used with LED light sources to vary the power supplied to the LED as the LED properties change with temperature changes. The circuit 10 may include a light connected downstream and in series with the driver 16. The relevant light may be any appropriately configured light, including an LED light 20, a fluorescent tube 22, and/or an incandescent light 24, each of which are illustrated in Figure 1. See generally 245 Patent, 5:42-59 & Fig. 1.

26. The adjustable resistor 14 may be enclosed within the light assembly when installed and therefore not accessible to outside without removal of the light, a configuration which effectively prevent an average Joe from accessing the same adjustable resistor 14. This allows the installer to adjust the wattage and lumen output at the time of installation, but does not allow subsequent altering of the wattage and lumen output without some barrier to doing so – namely, removal of the light assembly to access the linear resistor. Alternatively, adjustable resistor 14 may be selectively adjustable by a smart control system or have authentication/authorization permissions associated with an adjustment. See generally 245 Patent, 5:60-6:3 & Fig. 1.

27. By using the wattage limiter (which may be exemplarily implemented by the adjustable resistor 14), the purchaser, installer, or owner is no longer confined to the factory pre-sets for wattage and lumen output of industry-standard outdoor LED light fixtures. For instance, instead of purchasing ten different LED roadway lamps of different pre-set wattages for ten different installation points along a street being outfitted with energy efficient and long-life LED light fixtures (i.e., ten non-optimal LED roadway lamps), the purchaser can purchase a single LED roadway lamp for all installation points and "tune" the wattage and lumen output of each light fixture to the optimal wattage and lumen output for each installation point. The invention of the 245 Patent thus allows for near "infinite wattage" and lumen control adjustment up to the maximum rated output for the LED light array of the light fixture. See generally 245 Patent, 6:4-23 & Fig. 1.

28. To enable flexible and precise control over a light fixture's power output, the invention described in the 245 Patent includes an innovative hybrid and cooperative lighting control system in which a wattage limiter (which may be implemented with e.g., an adjustable resistor or selector) operates in tandem with a dimmer control, such as a standard 0–10V dimmer. The wattage limiter establishes a maximum wattage output from among multiple selectable preset options through a user-initiated selection for the fixture, while the dimmer control provides the wattage limiter, through its output means, an adjustable input signal, typically governed by a user selection, to vary the lighting level within that preset range between a minimum value corresponding to the lowest selectable output of the dimmer control and a maximum value corresponding to the established maximum wattage output. The light fixture's LED driver interprets the signal resulting from this interplay, such that the system collectively enforces a dynamic yet bounded lighting behavior.

29. In this innovative cooperative architecture, the wattage limiter and dimmer work in concert and function in a complementary manner in achieving desirable results otherwise simply unattainable by a wattage limiter and a dimmer control which are independently and separately provided (for example, in the prior art reference, Reed, cited by the PTO): the dimmer - in defining a corresponding minimum wattage output - offers granular control over wattage consumption, while the wattage limiter - in providing multiple selectable preset options of maximum wattage output and "hijacking" the adjustable input signal provided by the dimmer control and cooperatively maintaining or modifying the same input signal based on the user selection made thereon from among multiple selectable preset options (as opposed to overriding, discarding, or otherwise arbitrarily modifying the same input signal) before the cooperatively maintained or modified input signal is supplied to a downstream LED driver in a manner as if no such a "hijacking" has ever priorly taken place - ensures that wattage consumption remains within the selected maximum threshold while the granular control over wattage consumption as offered by the dimmer control is preserved.

30. In achieving the aforementioned desirable results, this innovative cooperative architecture allows for *leveraging in full* the power-regulating function and other features (as to LEDs) already expected of and provided by a downstream LED driver capable of interfacing and working with an adjustable input signal otherwise provided by an upstream dimmer control (such as a standard 0-10V dimmer) – there have already been an abundant number of, and there can be an unlimited number of, such LED drivers developed and made by manufacturers – without imposing any restriction on the selection and use of such a downstream LED driver.

31. Accordingly, this innovative cooperative architecture allows for both configurability at installation and ongoing dimming flexibility, while ensuring consistency with energy-saving and application-specific requirements. See generally 245 Patent, 6:4-23 & Fig. 1.

32. The invention set forth in the claims of the 245 Patent has been widely infringed. As set forth above, the DLC has even created a product attribute for "Field Adjustable Lighting" that encompasses "watt selectable" products. This is because the invention set forth in the claims of the 245 Patent has been widely successful commercially and therefore adopted (and infringed) by the lighting industry, including RAB Lighting.

## INFRINGEMENT ALLEGATIONS

33. RAB Lighting manufactures, uses, offers for sale, sells, and/or imports into the United States numerous lighting products that directly infringe one or more claims of the 245 Patent, including without limitation products within its **WPLEDFC Wall Pack Series**, such as the **WPLEDFC/WS**, and other product families that incorporate similar structural features and operational configurations.

34. By way of representative example, the **WPLEDFC/WS** wall pack lighting fixture includes multiple elements and characteristics that practice the inventions disclosed and claimed in the '245 Patent. Specifically, this product includes:

- **Selectable wattage settings** (e.g., 36W / 29W / 20W) via an **internal selector switch** accessible only through removal of a protective housing element, such as the lens cover;
- Support for **0–10V dimming control**, achieved through an industry-standard purple and gray wire pair intended for coupling to an external dimmer;
- An **integrated LED driver** and **output circuitry** that interprets both the selector setting and dimming input to produce controlled light output; and

- Marketing and instructional documentation identifying the product as **"Wattage Selectable."**

35.  These characteristics are consistent with, and embody, the system and method claimed in the 245 Patent, including a light fixture with a housing, a driver, an adjustable resistor or selector integrated into or on the housing, and dimmer compatibility to allow for further dynamic control of light output. The selector defines a maximum power output range, and the 0–10V dimming control allows the user to adjust brightness within that defined range. The LED driver interprets the resulting signal accordingly.

36.  In addition to the WPLEDFC series, RAB Lighting markets and sells numerous other infringing products that utilize the same underlying architecture, including but not limited to:

- **ALED5T/WS** Area Lights
- **FFLED39/WS** Floodlights
- **VXBRLED/WS** Vaporproof Fixtures
- **EZPAN/WS** Flat Panels

37.  All of these products (collectively, the "Accused Products") incorporate selectable wattage functionality through internal selector switches (located behind the lens cover or otherwise inside the fixture), support 0–10V dimming, and rely on integrated LED drivers that regulate power delivery based on the combination of the selector setting and the dimming input.

38.  RAB Lighting's marketing materials, datasheets, and installation manuals repeatedly highlight these characteristics. For example, the installation instructions for the WPLEDFC/WS clearly identify the presence of selectable wattage settings, reference the standard

purple and gray dimming control wires, and show that adjustments to output require access to components internal to the housing.

39. RAB Lighting has had knowledge of the '245 Patent and its claimed invention at least as of the filing and issuance date, if not earlier. Notwithstanding this knowledge, RAB Lighting continues to make, use, test, sell, offer for sale, and/or import products that infringe the '245 Patent.

40. Accordingly, RAB Lighting directly infringes at least claims 1, 2, 7, and 8 of the '245 Patent in violation of 35 U.S.C. § 271(a), both literally and under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing products including but not limited to those identified above.

41. Invictus has been harmed by RAB Lighting's unlawful conduct and seeks damages adequate to compensate it for such infringement, in no event less than a reasonable royalty under 35 U.S.C. § 284. Upon information and belief, RAB Lighting's continued infringement is willful, deliberate, and in reckless disregard of Invictus's patent rights.

42. Invictus further seeks enhanced damages, attorneys' fees, costs, and injunctive relief under 35 U.S.C. §§ 283–285.

## CLAIM ONE
### (Infringement of the 245 Patent)

43. Invictus repeats and realleges all preceding paragraphs, as if fully set forth herein.

44. RAB Lighting manufactures, uses, offers for sale, sells, and/or imports into the United States numerous lighting products that directly infringe one or more claims of the 245 Patent, including without limitation products within the Accused Products.

45. The Accused Products incorporate selectable wattage functionality through internal selector switches, support 0-10V dimming, and rely on integrated LED drivers that regulate power delivery based on the combination of the selector setting and the dimming input.

46. RAB Lighting's marketing materials, datasheets, and installation manuals repeatedly highlight these characteristics. For example, the installation instructions for the WPLEDFC/WS clearly identify the presence of selectable wattage settings, reference the standard purple and gray dimming control wires, and show that adjustments to output require access to components internal to the housing.

47. RAB Lighting has had knowledge of the 245 Patent and its claimed invention at least as of the filing and issuance date, if not earlier. Notwithstanding this knowledge, RAB Lighting continues to make, use, test, sell, offer for sale, and/or import products that infringe the 245 Patent.

48. Accordingly, RAB Lighting directly infringes at least claims 1, 2, 7, and 8 of the 245 Patent in violation of 35 U.S.C. § 271(a), both literally and under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing products including but not limited to those identified above.

49. Invictus has been harmed by RAB Lighting's unlawful conduct and seeks damages adequate to compensate it for such infringement, in no event less than a reasonable royalty under 35 U.S.C. 284. Upon information and belief, RAB Lighting's continued infringement is willful, deliberate, and in reckless disregard of Invictus's patent rights.

50. Invictus further seeks enhanced damages, attorneys' fees, costs, and injunctive relief under 35 U.S.C. §§ 283-285.

51.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a jury trial of all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendant as follows:

a. Entry of judgment declaring that Defendant infringes one or more claims of the Patent-in-Suit;

b. Entry of judgment declaring that Defendant's infringement of the Patent-in-Suit is willful;

c. An order awarding damages sufficient to compensate Plaintiff for Defendant's infringement of the Patent-in-Suit, but in no event less than a reasonable royalty, including supplemental damages post-verdict, together with pre-judgment and post-judgment interest and costs;

d. An accounting for acts of infringement;

e. Such other legal and equitable relief which may be requested and to which the Plaintiff is entitled; and

f. Such other and further relief as the Court deems just and proper.

Dated: July 15, 2025

Respectfully submitted,

*/s/ David L. Hecht*
David L. Hecht
dhecht@hechtpartners.com
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 851-6821

*Counsel for Plaintiff Invictus Lighting LLC*